UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SARAH ACUFF, *et al.*,

        Plaintiffs,

v.

        Case No.: 22-cv-12329
        Hon. Gershwin A. Drain

DY N FLY, LLC, *et al.*,

        Defendants.
_____/

## OPINION AND ORDER DENYING DEFENDANT DY N FLY, LLC'S MOTION TO DISMISS [#4]

### I.    INTRODUCTION

Plaintiffs Sarah Acuff, Kaitlyn Chester, Kacie Dietz and Amanda Smith filed the instant action against Defendants Dy N Fly, LLC (hereinafter "Dy N Fly" JWH Company, LLC, JWH2, LLC (hereinafter "JWH" and "JWH2"), and Jeffrey Hurley alleging claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000 *et seq.* as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981, and the Elliot-Larsen Civil Rights Act (hereinafter the "ELCRA"), Mɪᴄʜ. Cᴏᴍᴘ. Lᴀᴡs § 37.2101 *et seq.* for sexually hostile work environment and retaliatory termination.

Presently before the Court is the Defendant Dy N Fly's Motion to Dismiss, filed on November 29, 2022. Defendant Dy N Fly argues it cannot be liable under either Title VII or the ELCRA as a joint employer because it is a franchisor that does not possess sufficient control over the terms and conditions of employment nor does it have day-to-day supervisory responsibility over the JWH and JWH2 franchise employees.

Plaintiffs filed their response opposing Defendant Dy N Fly's Motion to Dismiss on December 20, 2022. Defendant Dy N Fly filed its reply brief on January 3, 2023. Upon review of the parties' submissions, the Court finds that oral argument will not aid in the disposition of this matter. Accordingly, the Court will resolve the present motion on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons that follow, the Court will deny Defendant Dy N Fly's Motion to Dismiss.

## II.   FACTUAL BACKGROUND

Plaintiffs were employed by Defendants JWH and JWH2, franchisees of Defendant Dy N Fly, a franchisor of eight "color only" hair salons. Defendant Jeffrey Hurley is the owner of JWH and JWH2, and he held a supervisory and managerial role over Plaintiffs during the course of their employment. In their Complaint, Plaintiffs allege that "Defendants are joint employers of Plaintiffs" and Defendant Dy N Fly "held significant integrated control of operations over the actions of Defendants JWH and JWH2." ECF No. 1, PageID.3.

Plaintiff Sarah Acuff worked for Defendants from approximately June 2020 through November 2021. *Id.*, PageID.4. Defendant Hurley frequently brought up sexual subjects to Acuff, asking her who she had "hooked up with" recently. *Id.*, PageID.5. He would tell Acuff that he believed coworkers were dressed in a sexually provocative manner. *Id.* He frequently commented about an eighteen-year-old female employee, Bella Cooper, that her "boobs are hanging out." *Id.* Around August of 2021, Hurley told Acuff that if his wife were not in the picture, he would be willing to have sex with a much younger woman. *Id.* at PageID.5-6. Hurley is much older than Acuff. *Id.* Once when Acuff's sister came into the salon to get her hair colored, Hurley made sexual advances to Acuff's sister in front of Acuff. *Id.* at PageID.6.

Plaintiff Kaitlyn Chester worked for Defendants from February of 2021 through May of 2021. *Id.* at PageID.9. She often caught Hurley staring at her and the other female employees for a long period of time. *Id.* Hurley also constantly made sexual comments to Chester about other coworkers he deemed to be provocatively dressed. *Id.* Chester witnessed Hurley frequently following Plaintiff Dietz around the workplace, touching her lower back on several occasions. *Id.* at PageID.10.

Plaintiff Amanda Smith worked for Defendants from July of 2020 through November of 2021. *Id.* at PageID.24. Hurley also made sexually inappropriate

comments to Smith, telling her that she was "so sexy." *Id*. On about three or four occasions, Hurley would get uncomfortably close while speaking with Smith and sometimes he would put his hand on her back. *Id*. He also commented about how other female coworkers were dressed. *Id*. In November of 2021, Hurley was in the breakroom with Smith and commented to her that she "stand over your husband that way." *Id*. at PageID.28. Smith left Dy N Fly shortly after this incident and because of Hurley's continued sexual harassment. *Id*.

    Smith told George Nikolaj, cofounder, and owner of Dy N Fly, about Hurley's conduct and that she quit working at Dy N Fly. *Id*. Nikolaj tried to talk Smith into staying at the job, but she told him she felt too uncomfortable. *Id*. Nikolaj apologized for Hurley's behavior, however he attempted to evade responsibility by sending her a text that stated:

> As for the incident report the only thing I can suggest is if you have some type of employee manual that you must've gotten through Jeff and his company, I am only the franchisor and I really have nothing to do with any of the other stuff I just really try to lend my support for the franchisees to succeed. But I thank you for your time with all of us.

*Id*. at PageID.29.

    Plaintiff Kacie Dietz worked as a salaried general manager for JWH from approximately the beginning of 2020 through November 15, 2021. *Id*. at PageID.12. Dietz originally met Hurley in the fall of 2019, and was introduced to him by Nikolaj, who asked Dietz to meet with them to work together in a business

4

venture to open new Dy N Fly locations. *Id*. Dietz had known and worked with Nikolaj for years. *Id*. Nikolaj and Hurley eventually persuaded Dietz to close down her own salon business to join the Dy N Fly endeavor. *Id*.

During the course of her employment, Hurley constantly made sexually inappropriate comments to Dietz. *Id*. He called her "babe," "baby," "beautiful," and "hot." *Id*. He also inappropriately touched Dietz dozens of times. *Id*. at PageID.13. He constantly put his hands on her lower back or shoulder when interacting with her. *Id*.

Hurley also sent Dietz countless inappropriate text messages. *Id*. On many occasions, he would send her text messages late at night, such as on November 14, 2020, at 12:51 a.m., inquiring "What's going on . . . Good night beautiful." *Id*. Later that day, Hurley dropped off some birchwood at Dietz's house as a gift to Dietz. *Id*. at PageID.15. Hurley also constantly watched Dietz on the salon video cameras. *Id*. at PageID.16-17. She knew this because he would call Dietz while she was working and he was not there and inform her that she looked "hot," and described what she was wearing. *Id*. at PageID.17. On one occasion when Dietz was mopping the salon floor, Hurley called Dietz and told her that he was masturbating while talking with her on the phone. *Id*. More than a dozen times, Hurley proposed to Dietz that they have an "after-work" meeting and have a drink together. *Id*. Dietz continually declined, but Hurley persisted. *Id*.

In October of 2020, while Dietz and Hurley were working late in order to prepare for the West Bloomfield Dy N Fly's grand opening, Hurley attempted to kiss Dietz. *Id.* at PageID.18. Dietz yelled for Hurley to stop. *Id.* After this incident, Hurley's sexual harassment stopped for about two weeks. *Id.*

Around May of 2021, Hurley arranged for a company team building night at the Detroit Athletic Club. Acuff, Chester, Dietz, Smith, and Hurley all attended. *Id.* at PageID.6-8, 10-12, 20-22, 26-28. Hurley rented a hotel room and became very intoxicated. *Id.* He sexually harassed the Plaintiffs during the event, sitting on the bed watching the women stylists drink and joked that everyone should go to the strip club. *Id.* Hurley made inappropriate compliments to each female employee. He stated that Chester was "confident about her body." *Id.* He announced that Acuff was attractive and beautiful despite being self-conscious about her weight. *Id.* Hurley told Acuff that when Dietz went into anaphylactic shock and was forced to use her EpiPen, which caused her to experience itchiness, he watched Dietz undress on the work video cameras, trying at every angle to get a glimpse of her breasts. *Id.*

At the end of the event, Acuff's father offered to drop each of the staff off at their homes. *Id.* Hurley insisted they could all fit in Acuff's father's car, however during the ride, Chester was forced to sit uncomfortably with the intoxicated Hurley half on her lap, with his left leg on her leg. *Id.* Hurley insisted he be

6

dropped off at Dietz's residence where he claimed he would arrange for an Uber to pick him up. *Id*. Hurley's proposal to be dropped off at Dietz's house did not sit well with Acuff after his comments earlier in the night. *Id*. For this reason, Acuff, Chester, and Smith decided to stay at Dietz's house to make sure Dietz was safe and Hurley would actually have an Uber pick him up. *Id*. Hurley waited at Dietz's house for a long time, making excuses because his Uber had not yet arrived. *Id*. Dietz pleaded with Acuff to stay so she would not be alone with Hurley. *Id*. After a long period of time, the Uber finally arrived for Hurley. *Id*.

Several days later, Hurley again mentioned to Acuff how he watched Dietz undress while she had gone into anaphylactic shock, and how he even showed the video footage to Dy N Fly President Cliff Lunney. *Id*. at PageID.8

After the incident in West Bloomfield when Hurley attempted to kiss Dietz, Dietz called Dy N Fly's owner and cofounder, Nikolaj to complain about Hurley's sexual harassment. *Id*. at PageID.19. Nikolaj was shocked and told Dietz he would speak with Dy N Fly's President Cliff Lunney about Hurley. *Id*. Nikolaj later called Dietz to inform her that he had spoken with Lunney and they were disturbed by Hurley's actions and would meet with Hurley soon to discuss his conduct. *Id*. Nikolaj also told Dietz to send the following text message to Hurley, which Nikolaj dictated to Dietz word for word:

> I love what I do at Dy N Fly and I am good at what I do. I need you to let me do my job. I have believed in Dy N Fly since day

7

> one and I believe our two locations can be two of the most successful in the franchise, but I need you to let me do my job to get them there without any non business [sic] related issues. I need you to let me do what I do best so I can make us all proud of your locations. Thank you.

*Id*. Hurley did not respond to Dietz's test message. *Id*. Neither Nikolaj nor Lunney followed up with Dietz to indicate the results of their meeting with Hurley. *Id*. In fact, Dietz does not know if Nikolaj and Lunney met with Hurley. *Id*. Prior to Dietz's complaint to Nikolaj, Lunney constantly visited the Dy N Fly locations where Dietz worked, approximately once per week. *Id*. at PageID.20. However, after Dietz's complaint, Lunney only visited the salon locations on occasion. *Id*.

Around 2021, Acuff was off from work due to sickness, with the mutual understanding that she would return to work when her health improved. *Id*. at PageID.8. While Acuff was out sick, Hurley fired Dietz after she expressed opposition to his sexual harassment. *Id*. Acuff claims that Hurley refused to hire her back once she was healthy because of her association with Dietz and Dietz's opposition to workplace sexual harassment. *Id*. at PageID.9. Chester eventually left work at Dy N Fly, largely because of the sexually hostile work environment. *Id*. at PageID.12.

After Hurley fired Dietz, she called Nikolaj to complain about the sexual harassment and Hurley's retaliatory termination. *Id*. at PageID.22. She told Nikolaj about Hurley's sexually inappropriate physical contact, his constant text

8

messages, his forced attempt to kiss her, and his watching her on the cameras while she was at work. *Id*. Nikolaj again told Dietz that he would speak with Lunney about Hurley's conduct. *Id*. Shortly thereafter, Nikolaj called Dietz back and told her that they were prepared to offer her a small severance payment of under $6,000, provided that she sign a waiver precluding her right to pursue any legal action against the company. *Id*. at PageID.23. Dietz rejected the offer. *Id*. Plaintiffs filed the instant lawsuit on September 30, 2022.

### III. LAW & ANALYSIS

#### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows the court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Ass'n of*

*Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 555).

The court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims. To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations and quotations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'– 'that the pleader is entitled to relief.'" *Id*. at 1950.

### B. Defendant Dy N Fly's Motion to Dismiss

"Title VII prohibits an employer from engaging in certain unlawful employment practices." *Rise v. McDonald's USA, LLC*, No. 1:20-cv-2, 2021 WL

5768436, at *1 (W.D. Mich. 2021) (quoting 42 U.S.C. § 2000e-2(a)). This includes Plaintiffs' claims for sexual hostile work environment and retaliation. 42 U.S.C. § 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 2000e-3 *et seq*.  Likewise, the ELCRA prohibits an "employer" from engaging in certain unlawful employment practices. MICH. COMP. LAWS § 37.2202(1). This includes Plaintiffs' claims for sexual hostile work environment, MICH. COMP. LAWS § 37.2202 and retaliation, M.C.L.A. § 37.2701(a).

      Defendant Dy N Fly argues it cannot be held liable under either Title VII or the ELCRA because it is franchisor and did not possess sufficient control over the day-to-day employee supervision required to be considered a joint employer.  "A conclusion that employers are 'joint' assumes that they are separate legal entities, but that they . . . handle certain aspects of their employer-employee relationship jointly."  *Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 593 (6th Cir. 2009).  The factors to consider in determining whether an Dy N Fly is the Plaintiffs' joint employer include "the entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance." *Id*.  In other words, Dy N Fly "can be liable if I has 'retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by [Franchisee].'" *Ries v. McDonald's USA, LLC*, No. 1:20-cv-2, 2021 U.S. Dist. LEXIS 233070, *5 (W.D. Mich. Dec. 6, 2021).

When examining whether an entity is a plaintiff's joint employer in the ELCRA context, courts apply the economic reality test. *Bolin v. General Motors, LLC*, No. 16-cv-13686, 2017 U.S. Dist. LEXIS 136665, *33 (E.D. Mich. Aug. 25, 2017). "The factors to be considered in applying the economic realty test are (1) control; (2) payment of wages; (3) hiring and firing; (4) responsibility for the maintenance of discipline." *Id.*

In support of its Motion to Dismiss, Dy N Fly attaches the Franchise Agreements it entered into with JWH and JWH2, as well as excerpts from its Brand Standards Manual. Plaintiff complains that pertinent pages from these documents are missing. Plaintiff further argues that none of these documents are referred to in the Complaint, nor are they central to Plaintiff's claims, thus they should not be considered under Rule 12(b)(6). Dy N Fly responds that it did in fact include the entire Operating Manual but concedes it has not attached its entire Brand Standards Manual. Dy N Fly argues it should not be required to do so because its Brand Standards are confidential.

Here, the Court concludes that Plaintiff has plausibly alleged Dy N Fly is a joint employer for purposes of Title VII and the ELCRA. Plaintiffs allege that Nikolaj, the cofounder and owner of Dy N Fly, personally introduced Dietz to Hurley for the purpose of her working as a manager for the JWH franchise locations. Moreover, Nikolaj dictated to Dietz word-for-word a text message for

her to send to Hurley pleading with him to "let her do her job." On at least two occasions, Nikolaj informed Dietz that he would speak with Dy N Fly's President, Lunney, and both would address Hurley's conduct with him. Finally, Plaintiffs allege Dietz offered her a small severance in exchange for her agreement not to sue the company. At a minimum, these allegations create the plausible inference that Dy N Fly "share[d] or codetermine[d] those matters governing essential terms and conditions of employment." *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985).

Dy N Fly's reliance on the Franchise Agreements' apparent disclaimer of any responsibility over personnel decisions is a factor that weighs against Plaintiffs' joint employer theory of recovery, "but it is *not* a decisive one, especially at the pleadings stage." *Myers v. Garfield & Johnson Enters., Inc.*, 679 F. Supp. 2d 598, 609-10 (E.D. Pa. 2010) (emphasis in original). Moreover, the Dy N Fly Brand Standards Manual, of which Dy N Fly only includes the table of contents, suggests that Dy N Fly imposes detailed policies governing terms and conditions of employment, including workplace sexual harassment guidance for JWH and JWH2 to apply, including:

    SECTION C: HUMAN RESOURCES
    • EEOC GUIDELINES
       o Employers Covered by EEOC-Enforced Laws […]
       o Record Keeping Requirements
       o Reporting Requirements

- o Charge Processing Procedures
- o Mediation
- o Remedies
- o Regulatory Enforcement Fairness Act
- o Technical Assistance
- o Informal Guidance […]
- LAWS REGARDING HARASSMENT
- o Sexual Harassment […]
- o [sections also on racial harassment, pregnancy discrimination, religious accommodation, and disability discrimination]
- WAGE AND LABOR LAWS […]
- JOB DESCRIPTIONS
- o Salon Manager
- o Colorist
- RECRUITING TEAM MEMBERS […]
- o Employment Applications
- o Evaluating the Application
- THE INTERVIEW PROCESS
- o Conducting Interviews
- o Reference Checks
- o Job Offer
- HIRING ON A TRIAL PERIOD
- ORIENTING NEW TEAM MEMBERS
- o Non-Disclosure Agreement
- o Establishing Personnel Flies
- o Overview of the Operation
- TRAINING TEAM MEMBERS
- o Training Tips
- o Initial Training
- o Ongoing Training
- CREATING PERSONNEL POLICIES FOR YOUR TEAM MEMBERS
- TIME TRACKING PROCEDURES
- UNIFORM AND DRESS CODE
- PROGRESSIVE DISCIPLINE PROCEDURES
- TERMINATION/SEPARATION PROCEDURES

- o   Termination
- o   Resignation
- SECTION D: DAILY OPERATING PROCEDURES […]
- • DAILY ROUTINES
- o   Opening and Closing Procedures […]
- o   Weekly Paperwork
- • CUSTOMER SERVICE PROCEDURES […]
- o   Answering Phones/Scripting […]
- o   Handling Client Complaints
- o   Handling Refund Requests […]
- • SETTING APPOINTMENTS
- o   Scheduling Appointments
- • SALON POLICIES
- o   Greeting
- o   Cancellation and Rescheduling
- o   Gratuity
- • MEMBERSHIP SALES […]
- o   How to Explain the Membership Discount Program's Benefits […]
- • PERFORMING THE SERVICE
- o   Client Check In
- o   Greeting the Client/ Consultation […]
- o   Upselling
- o   Recording Client Notes
- o   Sanitation Guidelines
- • SELLING RETAIL PRODUCTS […]
- • TRANSACTING SALES […]
- • REQUIRED SALON CLEANING AND MAINTENANCE […]
- SECTION E: MANAGEMENT PROCEDURES […]
- • MANAGING PERSONNEL

Dy N Fly's Brand Standards Manual's Table of Contents appears to show Dy N Fly exerts a high degree of control over Plaintiffs' terms and conditions of employment, governing everything from the interview process, training process,

15

discipline and termination process, sexual harassment policy, to minute details of employee daily routines – including how they should open and close facilities, answer phones, greet and check in salon customers, handle late customers, cancel hair appointments, and attempt to enroll customers into Dy N Fly membership rewards programs. Plaintiffs are entitled to Dy N Fly's complete Brand Standards Manual beyond the table of contents, as it is highly relevant to determine the scope of Dy N Fly's control over Plaintiffs' terms and conditions of employment.

Dy N Fly heavily relies on *Ries* in support of its contention that it is a franchisor with insufficient control over employee terms and conditions of employment to be held liable under Title VII and the ELCRA. *Ries*, 2021 U.S. LEXIS 233070, at *6. However, *Ries* is not controlling on this Court, and more importantly, it was decided on a motion for summary judgment after the plaintiffs had an opportunity to obtain discovery. In any event, *Ries* is distinguishable from the facts alleged here. In *Ries*, "[n]o one from McDonald's played a role in hiring . . . employees at its restaurants." *Id*. That is unlike the facts here where Dy N Fly's President had a significant role in hiring Dietz as a salaried General Manager for the JWH franchise location.

Finally, Dy N Fly appears to argue the EEOC's right to sue letters and conclusion that Plaintiffs were not in an employment relationship with Dy N Fly establishes Dy N Fly is not a joint employer for purposes of Title VII liability.

This argument lacks merit. An EEOC's decisions on the merits of a charge do not preclude trial in federal court. *See University of Tenn. v. Elliott*, 478 U.S. 788, 793 (1986). Here, while Plaintiffs may ultimately be unable to establish joint employment after discovery, the Court finds that they have pled sufficient facts to state a plausible basis to find Dy N Fly was their joint employer. For all of these reasons, the Court declines to dismiss Plaintiffs' claims against Dy N Fly at this stage of the proceedings.

## IV. CONCLUSION

Accordingly, for the reasons articulated above, Defendant Dy N Fly LLC's Motion to Dismiss [#4] is DENIED.

SO ORDERED.

Dated: May 5, 2023

/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 5, 2023, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager